SERENA M. MARTIN

v.

JOSEPH FIELDING MARTIN.

*Opinion filed November 1, 1897—Rehearing denied December 14, 1897.*

1. JUDGMENTS AND DECREES—*when order of county court is a final, appealable order.* An order of the county court, in a proceeding to require an executrix to produce certain securities claimed by her but alleged to be part of the assets of the estate, finding that the securities are the individual property of the executrix, is a final order, from which an appeal lies to the circuit court.

2. WAIVER—*question of jurisdiction of person waived by general appearance.* Objection as to the jurisdiction of the person is waived by general appearance and defending on the merits.

3. PRACTICE—*section 41 of Practice act, concerning propositions of law, applies only to cases where jury is waived.* Section 41 of the Practice act (Rev. Stat. 1874, p. 780,) concerning propositions of law, applies only to cases where the parties are entitled to a jury trial but waive the jury and submit the case to the court by agreement, and does not govern any case which is to be tried by the court without a jury without requiring the consent of the parties.

4. SAME—*section 41 of Practice act does not apply to proceedings had under section 81 of Administration act.* On appeal to the circuit court from a proceeding begun in the county court under section 81 of the Administration act, (Rev. Stat. 1874, p. 118,) to compel a person to appear and be examined touching an alleged concealment of assets of an estate, propositions of law need not be submitted to preserve questions of law for review on appeal.

5. APPEALS AND ERRORS—*Supreme Court may review facts on appeal from proceeding under section 81 of Administration act.* A proceeding begun in the county court under section 81 of the Administration act, relative to concealed assets, is in the nature of a chancery proceeding, and the facts are open for review in the Supreme Court though the Appellate Court does not recite any finding of facts.

6. SAME—*when bill of exceptions is a proper mode of preserving evidence in chancery case.* A proceeding in the county court under section 81 of the Administration act, concerning concealed assets, is in the nature of a bill for discovery and relief, and the evidence heard in the circuit court on appeal therefrom may be preserved for review by the certificate of the judge in form of a bill of exceptions.

7. GIFT—*effect of donor's collecting interest on securities in possession of donee.* The temporary surrender of securities by the donee to the donor, for the purpose of collecting interest and making an exten-

sion of time, does not affect the validity of the gift which the donor intended to be absolute, where the securities are again returned to the donee and retained in his possession.

8. SAME—*sufficiency of delivery to constitute a valid gift inter vivos.* The deposit of securities, transferable by delivery, by the owner in a safety deposit box rented by his niece, who carried the key and to whom he was under great obligations for services, accompanied by oral declarations and written memoranda that "everything in the box" was to be hers, that he "had no further claim" thereto and that he wanted his executors "to keep their hands off," constitutes a valid gift to the niece, although the uncle afterward took out and collected part of the securities and replaced them with others, and although, as to part of them, he had entered in his diary that his niece's ownership should be simultaneous with his death.

MAGRUDER, J., dissenting.

*Martin* v. *Martin,* 68 Ill. App. 169, reversed.

WRIT OF ERROR to the Appellate Court for the Second District;—heard in that court on writ of error to the Circuit Court of Kendall county; the Hon. C. W. UPTON, Judge, presiding.

ROBERT L. TATHAM, and HENRY S. WILCOX, for plaintiff in error:

Appeals lie only from final orders. Hurd's Stat. chap. 37, secs. 212, 226; chap. 3, sec. 123; *Leach* v. *Leach,* 50 Vt. 618; *Randolph* v. *People,* 130 Ill. 533; Woerner on Administration, sec. 545; *Ravatte* v. *Race,* 152 Ill. 672.

An order of the county court directing or refusing an inventory is not a final adjudication, but merely *prima facie* evidence. Hurd's Stat. chap. 3, secs. 51, 52, 56, 111; *Millard* v. *Harris,* 119 Ill. 199; *Leach* v. *Leach,* 50 Vt. 618; Gary on Probate Law, sec. 355; *Gold's case,* Kirby, (Conn.) 100; *Cameron* v. *Cameron,* 15 Wis. 1; *Willoughby* v. *McCluen,* 2 Wend. 609; *Hoover* v. *Miller,* 51 N. C. 79; Schouler on Executors, (2d ed.) secs. 235, 236; *Helton* v. *Briggs,* 54 Mich. 268; *In re Bell's Estate,* 25 Pa. St. 92; *Lynch* v. *Dwan,* 66 Wis. 490; *Simms* v. *Guess,* 52 Ill. App. 544.

The summary proceeding provided by sections 81 and 82 of the Administration act does not authorize a pro-

ceeding against an executor. *Simms* v. *Guess,* 52 Ill. App. 544; *Meinzer* v. *Bennington,* 42 Ohio St. 325.

·Assets converted by an executor are assets administered. *In re Richard & Campbell,* 38 Ill. App. 94.

Upon the death of the testate the title to personal property immediately vests in executors. *People* v. *Brooks,* 123 Ill. 249; *Hickox* v. *Frank,* 102 id. 663; *Neubrecht* v. *Santmeyer,* 50 id. 78.

The summary proceeding provided by sections 81 and 82 of the Administration act is not the proper remedy to try contested rights and title to. property. *Dinsmoor* v. *Bressler,* 164 Ill. 211.

The donee's possession is sufficient to prove a gift that the donor says he gives or has given. *Blake* v. *Jones,* Bailey's Eq. 141; Thornton on Gifts, 152; 8 Am. & Eng. Ency. of Law, 1319.

The donor need not put it out of his power to re-take or re-possess the thing given. *Grover* v. *Grover,* 14 Pick. 261; *Miller* v. *Meers,* 155 Ill. 298; Thornton on Gifts, secs. 209, 276; 8 Am. & Eng. Ency. of Law, 1351; *Chamberlain* v. *Williams,* 62 Ill. App. 423; *Otis* v. *Beckwith,* 49 Ill. 121.

Neither the county, circuit nor Appellate Court had jurisdiction or authority to try the title to the property in controversy in this probate proceeding. *Dinsmoor* v. *Bressler,* 164 Ill. 211.

HOPKINS, THATCHER & DOLPH, and N. J. ALDRICH, for defendant in error:

The findings of the Appellate Court on all controverted questions of fact are binding and conclusive upon the Supreme Court; and this rule applies not only to jury cases, but to cases submitted to the court without a jury. *Fitch* v. *Johnson,* 104 Ill. 111; *Bank* v. *LeMoyne,* 125 id. 253; *Hardy* v. *Rapp,* 112 id. 359.

The same rule applies to proceedings under section 81 of chapter 3 of the Revised Statutes. *Steinman* v̇. *Steinman,* 105 Ill. 348; *Miller* v. *People,* 156 id. 113.

An affirmance of the judgment by the Appellate Court is the equivalent of a finding of the facts the same as the circuit court. *Alphin* v. *Working*, 132 Ill. 484.

The judgment of the Appellate Court is final, not only as to the principal or ultimate facts upon which the right of recovery is claimed, but also in respect to the evidentiary and subordinate facts. *Alphin* v. *Working*, 132 Ill. 484.

The Supreme Court cannot go behind the judgment of the Appellate Court and consider what inferences might arise from particular facts appearing in the bill of exceptions. *Alphin* v. *Working*, 132 Ill. 484.

By defending upon the merits all objections that could have been taken to service or want of service are waived. *Mix* v. *People*, 106 Ill. 429; *Dean* v. *Gerlach*, 34 Ill. App. 235; *Hercules Iron Works* v. *Railway Co.* 141 Ill. 495.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

Edward Martin died at Red Hook, Duchess county, New York, December 3, 1893, leaving a last will and testament, which was admitted to probate in the county court of Kendall county, in this State, December 14, 1893, and in which Samuel Beers, John O'Connor and the plaintiff in error, Serena M. Martin, were appointed executors. The executors qualified, and on March 5, 1894, filed their inventory of real estate valued at $58,250, and personal property of the value of $323,655.03, as property of the estate. On April 24, 1894, the defendant in error, Joseph Fielding Martin, one of the residuary legatees, filed his petition in the county court against the executors, alleging that the inventory was incomplete, and that the executors, or some of them, withheld and secreted certain mortgages, school bonds and street railroad bonds belonging to the estate. The petitioner prayed for a citation, and that the executors be required to inventory said property and give an additional bond. The citation was ordered and issued, and there was a hearing August 20,

1894, when the petitioner filed an amendment to his peti-
tion charging that plaintiff in error had in her possession
certain notes, bonds, mortgages, school bonds, etc.,—the
property of the estate which she claimed as her own prop-
erty.   He therefore prayed that she be required to bring
the same into court and to abide the further order of the
court.  The executors, by their answer filed the same day,
denied that they, or either of them, had withheld or se-
creted any property of the estate, or that they had in their
possession, as executors, the mortgages, contracts and
bonds in the petition mentioned.  Upon the evidence ad-
duced at the hearing the court found that the executors
had inadvertently neglected to inventory $40.25 cash,
which they were directed to inventory, but held that the
mortgages, school bonds and street railroad bonds men-
tioned in the petition were not a part of the estate of the
said Edward Martin, deceased, and were the individual
property of the plaintiff in error.   From this order the
petitioner appealed to the circuit court.

On the hearing in the circuit court the executors moved
to dismiss the appeal because the order appealed from
was not final, and, the motion being overruled, they ex-
cepted.  Plaintiff in error also protested that she was not
in court in her individual capacity, and that the court had
no jurisdiction to try the issue against her.   The court
reserving his decision, she filed her answer denying the
jurisdiction so far as her personal interest was concerned,
and also denying that the property described in the
amended petition was the property of the estate, and
claiming it as her individual property.   The court held
that he had jurisdiction, and found that all the securities
in dispute belonged to the estate, and ordered plaintiff
in error to turn over the same, with all moneys collected
thereon, to the executors, to be accounted for under the
direction of the county court.  Plaintiff in error sued out
a writ of error from the Appellate Court for the second
district, where, on a review of the record, the order was

affirmed, except as to what were called "the Illinois farm mortgages," amounting to $50,200, as to which it was reversed, and the cause was remanded with directions to enter an order finding the same to be the individual property of plaintiff in error. The record of the Appellate Court is now brought here, with assignments of twenty-nine errors by plaintiff in error and fourteen cross-errors by defendant in error, Joseph Fielding Martin.

It is first contended by plaintiff in error that the motions made in the circuit court to dismiss the appeal should have been sustained, because the order of the county court appealed from was not a final order, and because the court had not acquired jurisdiction to adjudicate upon her individual rights. The argument upon that question proceeds upon the mistaken assumption that the proceeding in the county court was merely for the purpose of correcting an inventory alleged to be incomplete, in which the court would retain a continuing jurisdiction over the executors until the final settlement of the estate. The petition as first filed was of the character claimed, and set out a large amount of securities which it was alleged that the executors, or some of them, had withheld from the inventory, and also prayed that the executors should be required to file a supplemental or amended inventory containing the same. Plaintiff in error was cited with the other executors, and appeared in that proceeding. When the hearing on that petition commenced, August 20, 1894, the sworn amendment to the petition was filed charging that plaintiff in error had possession of the securities and claimed them as her property, and praying that she be required to bring them into court and should abide the further order of the court. This was a change of the proceeding to correct the inventory against the executors generally to one against plaintiff in error individually, under sections 81 and 82 of the Administration act. The hearing proceeded from day to day under this amended petition until August 22, 1891, when the order of the court

was entered. The proceeding under these sections is to a large extent informal. No provision is made for an answer, or any pleading further than a statement upon oath, and no formal particularity is required to give the court jurisdiction. (*Blair* v. *Sennott,* 134 Ill. 78.) Plaintiff in error, against whom the amended petition was directed, did not formally answer the charge against her, but there was a hearing before the court where she was represented, and she succeeded in establishing her claim to the individual ownership of the securities. In the final order the county court required the executors to inventory $40.25, which was a trifling matter compared with the issue between petitioner and plaintiff in error, and that issue was decided in her favor. The order found that the securities were not property of the estate, but were her individual property. That was the end of the proceeding and a final determination of the issue raised by the amended petition, so far as the county court was concerned. The order was a final one, from which an appeal could be taken.

After the appeal to the circuit court a stipulation to take depositions was signed by attorneys for plaintiff in error in her personal right, and service of numerous notices was acknowledged in the same way. At the hearing in the circuit court she appeared, answered and defended in her individual right, although protesting against the jurisdiction. The protest was not against the jurisdiction of her person,—and it would have made no difference if it had been, since any objection of that kind was waived by the entry of a general appearance and defending on the merits. (*Hercules Iron Works* v. *Elgin, Joliet and Eastern Railway Co.* 141 Ill. 491; *Mix* v. *People,* 106 id. 425.) The protest was against the power of the court to try the issue, and therefore related to the subject matter. It was unfounded, as the county court acquired jurisdiction of the subject matter by the amended petition.

There are some questions of practice which relate both to the errors and cross-errors assigned, and as the deci-

sion on those questions will dispose of a large part of the argument on each side they will be considered together.

In the circuit court both parties submitted written propositions under section 41 of the Practice act, to be held as law in the decision of the case, and the argument for plaintiff in error is largely devoted to the action of the court in refusing and modifying propositions so submitted by her and in holding propositions submitted by the petitioner. There is also an argument on the facts in her behalf. In the Appellate Court the order of the trial court was reversed in part and the cause was remanded, with directions to enter a specific order different from the one reversed, but the Appellate Court did not recite in its judgment any finding of fact concerning the matter in controversy different, either wholly or in part, from the findings of the trial court, as provided in section 87 of said Practice act. It is therefore argued for defendant in error, that the Appellate Court, not having recited any facts in its final judgment, is presumed to have found them the same as the trial court; that the judgment of the Appellate Court conclusively settles the facts according to the findings of the trial court; that not finding the facts different from the trial court, it could not reverse the judgment in whole or in part, and that therefore the partial reversal was erroneous. Both parties, to sustain these alleged errors, rely upon the Practice act as governing the proceeding.

Section 41 of the Practice act provides, that in all cases where both parties agree that both matters of law and fact may be tried by the court, either party may submit written propositions to be held as law in the decision of the case, and either party may except to the action of the court in passing upon them. The section only applies to those cases where the parties are entitled to a trial by jury, which right they may waive and submit their controversy to the court. It is indispensable that the parties should agree to a trial of the cause by the court without

a jury to enable the court to proceed under that section. (*Hermann* v. *Pardridge*, 79 Ill. 471.) It does not govern any case which is to be tried by the court without the intervention of a jury, in the absence of agreement or consent by the parties.

Questions as to the relations of the Practice act to proceedings under the sections of the Administration act now under consideration have been before the court with the following results: *Steinman* v. *Steinman*, 105 Ill. 348, was such a proceeding, and the court refused to consider controverted questions of fact, holding that the judgment of the Appellate Court settled them, and also holding that as no propositions of law were submitted there was no question for decision. In *Blair* v. *Sennott, supra,* (a like proceeding,) it was considered that the Practice act did not apply to such proceedings in the county court, and it was said (p. 84): "There is no mode by which the evidence given in a proceeding before the probate court can be lawfully preserved and made a part of the record." In *Miller* v. *People*, 156 Ill. 113, the court declined to decide the question whether either party could insist upon a trial by jury, saying that if the right was conceded to exist it had been waived, but did, in effect, hold that there was such a right by following *Steinman* v. *Steinman, supra,* and decided that nothing was presented for review because no written propositions of law were submitted to the trial court and the decision of the Appellate Court had conclusively settled the facts. But in *Dinsmoor* v. *Bressler*, 164 Ill. 211, the purpose of the sections of the Administration act in question and the cases to which they were applicable were explained, and it was held that the parties were not entitled to a trial by jury. It was there said (p. 222): "If sections 81 and 82 could be used to settle contested rights to property as between executors and administrators on the one side and third persons on the other, they would operate as an infringement upon the constitutional right to trial by jury, as they contain no

provision for a jury trial." The *Steinman* and *Miller cases* were not referred to, but they were practically overruled by that decision, which we think must be conceded to be correct.

A proceeding of this nature in the county court sitting in probate was unknown to the common law, and jurisdiction in cases involving such questions was vested in ecclesiastical or chancery courts, which had no jury. Although county courts are without general chancery jurisdiction, yet in probate matters they have jurisdiction of an equitable character and may adopt the forms of equitable proceedings. (*Moore* v. *Rogers*, 19 Ill. 347; *Dixon* v. *Buell*, 21 id. 203.) In the case of a guardian's report made under the order of the county court it was said: "As the proceedings before the probate court are likened to proceedings in chancery, this may be likened to a bill for discovery against the guardian, wherein it is necessary to sift his conscience, and to get at facts of which he alone could have any knowledge." (*Gilbert* v. *Guptill*, 34 Ill. 112.) The case of *Heward* v. *Slagle*, 52 Ill. 336, involved the settlement of an account of administrators, and the court said (p. 340): "We take occasion to say, in a case of this kind the probate court should, on the trial of it, proceed as though a bill in chancery had been filed, hear the evidence and investigate the account without the intervention of a jury, unless it should appear to be necessary to impanel a jury to try some issue of fact that may be made up, as in ordinary chancery cases." *In re Steele*, 65 Ill. 322, was a proceeding to compel guardians to account, and it was said that the citation to account was not a suit at law but the exercise of a summary power conferred by the statute, which was likened to a bill in chancery.

The sections now under consideration were substituted for section 90 of the Statute of Wills, which was of the same nature. It was said of that statute that its purpose was to enable executors and administrators, and parties having an interest in an estate, to discover assets, and

to enable the court to compel the person charged with having the property, to discover, on oath, whether he had property of the estate in his possession. (*Wade* v. *Pritchard,* 69 Ill. 279.) In *People* v. *Abbott,* 105 Ill. 588, it was held that, even if it were proved that property of the deceased was in the possession of another party, the court, in the summary proceeding provided for in the Administration act, is not bound to order it delivered to the executor or to make any specific order, but is vested with discretion, and should look beyond the mere legal right and protect equitable rights. In such a case of the exercise of equitable jurisdiction and discretionary powers a party is not entitled to a trial by jury.

As there was no right to a jury trial, section 41 of the Practice act does not govern, and it was not necessary to submit propositions of law. As the proceeding is governed by equitable principles and practice, the facts are still open to investigation in this court, and it was not necessary that the Appellate Court should recite in its judgment a finding of facts. The sections of the Practice act relied upon do not apply to cases of this kind. *Moore* v. *Tierney,* 100 Ill. 207.

Plaintiff in error claims the securities as a gift from Edward Martin in his lifetime, and she insists that the court could not, under this statute, try the question of her ownership of them. The primary purpose of the statute is to discover assets of estates, and the court is authorized to make such order in the premises as the case may require. The statute is not designed to afford the means of collecting debts due to estates, (*Williams* v. *Conley,* 20 Ill. 643,) nor to try contested rights and title to property between the executors and others. (*Dinsmoor* v. *Bressler, supra.*) The mere fact that one party to the controversy is an executor will not justify depriving the other party of a trial by jury or authorize his imprisonment, but in a proper case the court may order the property or effects to be delivered up, or the proceeds or value thereof in

case the same has been converted. It might be a proper order to direct executors to resort to some other court having jurisdiction to enforce the rights of the estate, but in a case where some trust relation exists, or there is any other condition authorizing the court to order a delivery of the property and enforce obedience to its order by imprisonment, the court may make such an order. *Blair* v. *Sennott, supra,* was such a case, where it was held that the agent was not the debtor of his principal, but his trustee, and the order that he should deliver moneys in his hands as such trustee was sustained. In this case the plaintiff in error, who was proceeded against, is one of the executors, and could not be both plaintiff and defendant in a suit at law. If she held property, claiming the same as her own, which belonged to the estate being administered under the jurisdiction of the county court, and of which she was one of the executors, the relation afforded ground for an equitable proceeding against her. It is one of the cases where the court may properly order a surrender of property, and enforce a duty owing by the trustee in the manner provided by the statute.

The evidence of the respective parties taken before the circuit court was duly preserved by the certificate of the judge, under the form of a bill of exceptions, which is the equivalent of a certificate of evidence, and a proper mode of preserving the evidence in chancery causes in that court. As the proceeding was in the nature of a bill of discovery and for equitable relief, it was proper to so preserve the evidence for the purpose of review.

The securities in controversy were in the possession of the plaintiff in error at and before the death of Edward Martin, and there is no question whatever but that he intended to give them to her and fully supposed that he had made a valid gift of them to her. The facts showing his intention, and the gift as he understood it, are as follows: He lived on a farm at Red Hook, New York. She was his niece, and went to live with him and help look

after his home when she was nine years old. He lived
to be eighty-three years of age and she resided with him
about forty-eight years. Until about fourteen years be-
fore his death, his sister, an aunt of plaintiff in error,
also made her home with him and had charge of the place
during his absence, but she then died, and after that time
plaintiff in error took full charge of the home. While she
so lived with him she did all kinds of work about the
house, milked cows and made garden, and only had as-
sistance in later years when failing health required it.
She was not only his servant, but in later years, at least,
was also his companion. In his old age she went with
him on his journeys and attended him in the winters while
sojourning in Florida. He regarded her with great affec-
tion, fully appreciating what she had done for him, and,
being a very wealthy man, expressed his intention to make
ample provision for her and to give her sufficient prop-
erty to make her independent. He deeded her the home
farm at Red Hook, and on June 20, 1890, went to the
Poughkeepsie National Bank with her, where she rented
box 65 in the safe deposit vault and paid the rent for it.
He then made the following entry in his diary: "June 20,
1890.—Went to Poughkeepsie with Serena M. Martin. She
rented box 65 in Pok. S. D. vault and pd. $7.50 to Jan'y 1,
'92. I put ten street R. Co. bonds, $1000 each, in her box,
being a delivery to Serena of the bonds now but her own-
ership to them to be simultaneous with my death." Under
date of November 21, 1890, he recorded in the diary that
he "put $11,000 of school bonds in Serena M. Martin's
box, No. 65, for her. * * * I also told cashier Corn-
wall that I had put securities in my niece's box and that
they thereby became her property,—that I had no claim
upon the contents of her box and didn't want any other
fellow to have." On December 13, 1890, he wrote the fol-
lowing letter, which he put in the safe deposit box with
directions to her to open it after his death:

"RED HOOK, N. Y., *December 13, 1890.*

"*Miss Serena M. Martin:*

"MY DEAR NIECE—I have placed in your box in safe deposit vault in Poughkeepsie National Bank certain bonds, securities, deeds, bills of sale, etc., which I have given to you and delivered to you, and I write this that there may be no doubt of the fact that everything in your box is yours absolutely. Judge Taylor, of Poughkeepsie, and George Cornwall, cashier of the Poughkeepsie National Bank, have knowledge of my intentions, as above.          "Your affectionate uncle,

EDWARD MARTIN."

On April 15, 1892, he wrote in his diary: "Took Serena to S. D. vault and she cut the coupons from Minnesota State bonds." On October 11, 1892, he records that he put "three mortgages and notes by the Catholic Bishop of Chicago, aggregate $25,000, in Serena M. Martin's box in safe deposit vault in Poughk. N. Bk." The plaintiff in error kept box 65 in the safe deposit vault until it became too small for her needs, when she rented box 82 at eight dollars per year, and we find this fact recorded by Edward Martin in his diary under date of December 10, 1892: "Went to Poughkeepsie with my niece and put ten notes and mortgages in Serena's box 82, and she gave up 65, it being too small for her papers." In his entry under date of May 3, 1893, he wrote that he "also put two notes of H. Phipps, Jr., [$100,000] in S. M. Martin's box." His last entry of this nature is under date of June 14, 1893, where he says that "Serena put Ill. farm mortgages and notes in her box, and I took Phipps, Jr., notes and certificates of deposit in Ill. Tr. & Sv. Bank and Am. Tr. & Sv. Bk. from the box to take to Chicago." On May 13, 1892, he wrote a letter, which was also put in the box to be opened after his death, directed to her, in which he told her about his will and certain securities then in the box, amounting to $55,000, saying that they were her private property as well as the homestead and an equal share of his residuary estate with the legatees named in his will, in which he gave her two of the forty-two shares into

which it was divided. He also gave her advice about guarding her property and gave the names of the banks with which he had accounts. This letter was opened and an addition made December 15, 1892, as follows: "Some of the bonds [$30,000] named above as in your box have matured and been collected, and assignments of other notes and mortgages than those before named will be added to your personal estate from time to time, at my convenience, and placed in your box in the safe deposit vault, and everything in your box is yours.—Edward Martin." In June, 1893, he told Samuel Beers, one of his executors, at a meeting in Chicago, at a time when he went with plaintiff in error and others to the World's Fair, referred to in the diary entry of that date, that he had provided for Serena; that he had deeded the farm at Red Hook to her; that he had provided for her otherwise; that he had given her more than she could reasonably spend; that the best of his securities were getting into Serena's box, and that she had a box in Poughkeepsie in her own name and carried the key. In November, 1893, about a month before his death, he again told Beers that he had put personal property in Serena's box which was her property, belonging to her; that it was no part of his personal estate, and that he wanted his executors to keep their hands off of it. He shook his head in his own decided way and said, "I mean what I say now." He also told Margaret J. Martin, just before his final sickness, that Serena had done her share and more than her share, and that he intended she should spend the remainder of her days with comfort, without work.

The securities, with the exception of the Illinois farm mortgages, which the Appellate Court held were the property of the plaintiff in error, were in this safety deposit box at the death of Edward Martin. She had the key, and had had it from the time that the first box was rented, with absolute control over the box and its contents. The Illinois farm mortgages were also in her possession be-

fore and at the death of Edward Martin, wrapped up in a piece of curtain calico and kept in a closet in her room. With them were duly executed assignments of them to her. The securities were two notes of H. Phipps, Jr., $100,000, secured by mortgage; street railway bonds, $10,- 000; school bonds, $7000, and Illinois farm mortgages, $50,200, amounting in all to $167,200, all in her possession, either transferable by delivery or assigned to her.

It is insisted that this possession was not evidence of ownership, because all the securities belonging to the deceased were also in her possession. But this does not accord with the evidence. He had what he called the "rat-proof box," which was kept in the closet of his bedroom, where other securities were kept. It was locked with a combination lock, and the evidence shows that whenever it was opened and she was present he was also there, and that he had entire control of it. The letter of May 13, 1892, put in the safe deposit box to be opened after his death, gave her the combination by which his box could be opened, as follows: "To open 'rat-proof' place letters C. A. C. O. in line of the notches on the lock and you can draw it out and open it." His property was in his home when he died, and the most that can be said of any of it is, that it was accessible to her and she might have purloined it, but there is not a shadow of suspicion that she did so. It is proved, beyond question, that the mortgages in the calico wrapper had been delivered to her and under her control for some time before his death, and if he wanted to see them he asked for them and re-delivered them to her. The securities in the safe deposit box were transferable by delivery. The box was hers and she had the keys, and if a coupon or paper was ever given to him for any purpose she got it for him. He could not get one of them except by her giving it to him. Any security that was in the box and now in controversy, that had been handed him for any purpose, had been returned to her.

170—3

It is argued that deceased intended a testamentary disposition of the securities, which would be void because the forms required by the Statute of Wills were not observed. This argument is based upon the facts that he collected interest as it matured, up to the time of his death; that he executed an extension in his own name of the Phipps notes and mortgage for $100,000, and that the diary entry concerning the street railroad bonds, and a notation of transfer on each bond, showed that the gift of such bonds was to take effect at his death. He did collect the interest,—and this applies equally to the Illinois farm mortgages and to the securities in the box. Although he had executed and acknowledged formal assignments of those mortgages, she gave them to him and he collected the interest, and also collected interest on the securities in the box and returned them all to her. There is no evidence under what arrangement or with what understanding between him and her this was done, but we do not regard the fact as sufficient to overcome the evidence of an absolute and irrevocable gift. He had previously done all that was necessary, in law, to invest her with an absolute legal title, and again returned them to her. Aside from the street railroad bonds, we do not see how he could, in the face of his acts, statements and diary entries, have asserted any title to the property as against her, nor, if she had died, how he could have reclaimed them from her heirs. He was a thorough business man and the head of the household, and the fact that she gave coupons or securities into his possession, and that he collected interest or executed the extension in his own name, may as well be attributed to the relations of confidence, love and respect existing between them, and her wish that he should attend to the business, as to any understanding between them that the transaction was in fact different from what it purported to be, or an acknowledgment on her part of any title in him. Even if he mistook the effect of his acts, and believed that he could still

control the property after the transfer to her, that would not change the actual character of the transaction, as counsel seem to suppose. Neither he nor his heirs could be heard to say that a man of his business experience and ability did not intend the legal effect of what he had done.

Deceased told Beers that he would find in his inventory book a list of his property from which to make an inventory. On that book these securities, with others, were listed; and as to the Illinois farm mortgages, with one exception there was a note, "Assigned to S. M. Martin," but as to the other securities there was no such notation. This is pressed as a fact of much importance showing that they had not been given to her; but it must be remembered that in the same conversation he said to the same witness that the securities in her box were no part of his estate, and that he wanted his executors to keep their hands off of them. Taken in connection with this statement, the failure to note on the inventory book the gift of part of the securities to her is of trifling weight, and especially in view of the fact that as to one of the mortgages of which he had executed and acknowledged an assignment to her there was no note of the fact. The other securities did not require assignments, and the notation may have been made because of the formal transfer. Even then it was omitted in one instance.

The diary entry on the day that the safe deposit box was rented shows that the street railroad bonds were then put in the box, followed by the statement, "being a delivery to Serena of the bonds now but her ownership to them to be simultaneous with my death." There are subsequent entries and numerous statements of a present gift of all the securities in the box, but there was on each of the ten bonds a note of transfer indicating a life estate in Edward Martin, with a remainder to Serena M. Martin after his death. The bonds provided for registration in the owner's name on the company's books, the registry

being noted on the bond, and for the transfer of registered bonds by the registered owner to be also noted on the bond. There is no note of a registration on these bonds, but there is a note of transfer. Under "Date of transfer" appears, "Jan. 20, 1885," and under the title "To whom transferred" is the following: "Edward Martin, or Serena M. Martin at his death.—W. H. Lupp, Sec'y." There is no evidence who made this minute on these bonds, but in form it appears to have been written by W. H. Lupp. Who he is does not appear or for what company he was secretary. The only meaning that can be given to it is, that there was a transfer of the bonds to Edward Martin for life and to Serena M. Martin at his death; and such a transfer is not void, as against the Statute of Wills, in the case of real estate, (*Harshbarger* v. *Carroll*, 163 Ill. 636,) and we do not see why it should be in the case of personal property. An estate for life in one may be created in personal property with remainder to another. 6 Am. & Eng. Ency. of Law, 883.

The reason for putting the letters in the box to be opened after his death only appears by inference. They were explanatory, and the longer one also of an advisory nature. There had been a delivery and acceptance of whatever was in the box, and the letters would not serve to overcome the gift thereby completed.

The judgment of the Appellate Court, so far as it affirms the order of the circuit court, is reversed and the cause is remanded to the circuit court, with directions to enter an order in accordance with the views herein expressed, finding that the property in controversy is the individual property of plaintiff in error and for the delivery of the same to her.      *Reversed and remanded.*

Mr. JUSTICE MAGRUDER, dissenting.